1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MIKE FINCHEN,

                Plaintiff,

        v.

HOLLY-MATT, INC., a Washington
corporation, *in personam*;

                Defendant.

CASE NO. C04-1285RSM

MEMORANDUM AND DECISION

Plaintiff Mike Finchen brings this seaman's injury action pursuant to the Jones Act, 46 U.S.C. § 688, and general maritime law.  He alleges that he was injured while working aboard the *F/V Lady Jessie*, owned by defendants,  in the Alaska Opilio crab fishery.  Defendants have denied liability for plaintiff's injuries.   The matter was tried to the Court in a four-day bench trial commencing on February 21, 2006.  The Court has fully considered the evidence presented at trial, the exhibits admitted into evidence, and the argument of counsel, and being fully advised, now makes the following Findings of Fact and Conclusions of Law, and renders a decision.

FINDINGS OF FACT

1.  Mike Finchen is a journeyman stonemason.  In December 2003 he met Captain Randy Griffith in a bar in Seattle and accepted the offer of a job as a deckhand aboard the *F/V Lady Jessie* for the upcoming Opilio crab (snow crab)season.   Randy Griffith also hired Mark Chinitz as a deck hand, and

MEMORANDUM AND DECISION - 1

1  Bob deWeiss to act as deck boss and engineer.  Bob deWeiss was an experienced engineer and deck
2  crane operator.  Both plaintiff and Mark Chinitz were inexperienced as seamen.

3      2.  In January, 2004, Mike Finchen, Mark Chinitz, and Randy Griffith flew by commercial aircraft
4  from Seattle to Kodiak, Alaska.  Another deck hand, Stan van Metre, was hired in Kodiak.  Stan van
5  Metre had previously worked on fishing boats in the Bering Sea.   The captain and crew lived and worked
6  on the *F/V Lady Jessie* in Kodiak to prepare the ship for the fishing season.  They then traveled to Dutch
7  Harbor, Alaska, where Bob deWeiss joined the crew.

8      3.  The testimony of Mark Chinitz was presented by perpetuated deposition.  He testified to
9  traveling from Seattle to Kodiak on the *F/V Lady Jessie*, together with plaintiff and the captain, Randy
10 Griffith.  He also testified in some detail to events that occurred during that voyage.  However, it is
11 undisputed that the voyage did not occur, as the vessel was already in Kodiak and the captain and two
12 crew members flew from Seattle to Kodiak to meet her.   The Court therefore finds that Mark Chinitz is
13 not a credible witness, and his testimony shall be disregarded.

14     4.  Some inspections and maintenance were performed on the boat in Kodiak and Dutch Harbor.
15 Stan van Metre testified that the boat underwent a Coast Guard safety inspection, which revealed a
16 "frozen" door latch and a faulty or missing fire extinguisher; Mr. Van Metre was not certain about that.
17 These defects were corrected.

18     5.  When Bob deWeiss came on board in Dutch Harbor, he determined that there was a
19 problem with one engine, requiring replacement of the head.  He used the deck crane to bring a new
20 engine head onboard, as well as to move crab pots around the deck.

21     6.  During crab fishing operations, the deck crane is used to move the empty 700-pound crab pots
22 from the stack on deck to the launcher, which puts them in the water, and from the launcher back to the
23 stack.  Bob deWeiss was the main operator of the deck crane.  He testified that at no time during crane
24 operations, other than when the pot was actually being lowered onto the launcher or the stack, was there
25 more than two feet of line between the end of the crane boom and the crab pot.   He also testified that he
26 advised the other crew members at the beginning of the voyage to stay away from the pots when they
27 were being stacked, and frequently had to yell at them, particularly plaintiff, to remind them to stay out of

28  MEMORANDUM AND DECISION - 2

1  the way when the pots were being moved.  Stan van Metre testified that plaintiff and Bob deWeiss often

2  argued loudly and swore at each other.

3      7.  Plaintiff, Mark Chinitz, and Stan de Metre all testified that at times the cable did not pay out

4  properly from the spool.  Bob deWeiss testified that this mainly occurred when one of the deck hands,

5  not he, was operating the crane and allowed the cable to become kinked.  When that happened, they

6  would have to stop operations and rewind the cable properly.  They did so each time this occurred during

7  the voyage, which Bob deWeiss recalled as being "maybe ten times."  Stan van Metre testified that the

8  roller at the tip of the boom (the "shiv") was not working properly.  Bob de Weiss stated that this was the

9  lower of two rollers at the tip of the boom;  the first roller had a gap that the cable would run through and

10 was working properly. From the first roller the cable would pass over the lower one, which was frozen so

11 that the cable had to slide, rather than roll, over it.  This was the only crane malfunction that Bob deWeiss

12 observed, and it did not affect operations.   The roller was replaced after the crab season and before the

13 *F/V Lady Jessie* began tendering, which involved lifting of heavier loads.

14     8.  Plaintiff, Mark Chinitz, and Stan van Metre all testified that at times there were more than two

15 feet of cable between the end of the boom and the crab pot, allowing the crab pot to swing during

16 operation of the crane.   The amount of extra cable to which they testified varied from three to eight feet.

17 Mark Chinitz originally stated that there was "a foot or two" of cable between the end of the boom and

18 the crab pot.  Upon further questioning, he said that it was four, five, or six feet of cable, and then he

19 stated that it was seven or eight, but it varied.  His testimony, as already noted, is not credible.  Stan van

20 Metre stated that the cable did not pay out properly from the spool because of the defective roller, but

21 that extra line was "not typical."  Plaintiff, on the other hand, testified that because the line did not pay

22 out properly it was left long, approximately eight feet long, the entire trip.  This was in direct

23 contravention to the testimony of Bob de Weiss, who actually operated the crane, and testified that at no

24 time during crane operations, other than when the pot was actually being lowered onto the launcher or

25 the stack, was there more than two feet of line between the end of the crane boom and the crab pot.   The

26 Court finds that the testimony of Bob deWeiss can be reconciled with Stan van Metre's testimony, but

27 not with plaintiff's self-serving testimony that the cable was left eight feet long for the entire journey.  For

28  MEMORANDUM AND DECISION - 3

1  reasons which will be detailed below, the Court finds plaintiff's testimony not entirely credible.  The

2  Court therefore rejects plaintiff's testimony on this point, and finds that only when the crab pots were

3  being lowered onto the launcher or the stack was the length of cable between the end of the boom and

4  the crab pot greater than two feet.

5       9.  On January 19, 2004, while working, plaintiff was hit in the side of the head by the end of the

6  cable, termed by seamen the "headache ball."   Plaintiff did not state, and he did not report to any treating

7  physician, whether he was wearing a hard hat at this time, nor was there any testimony as to whether the

8  wearing of hard hats is the usual practice on crabbing boats.  The blow caused a headache but no open

9  cut, and no lasting effect.  Stan van Metre testified that he saw this occur.  Mark Chinitz also testified

10  that he saw this occur, but stated with certainty that it occurred on the voyage from Seattle to Kodiak.

11  As noted, no crew members traveled on the Lady Jessie from Seattle to Kodiak, so this testimony is not

12  credible.   Plaintiff agreed on cross-examination that this headache ball encounter was a "non-incident."

13       10.  Plaintiff testified that on January 21, 2004, he was struck by a swinging crab pot.  Plaintiff

14  testified that it struck him high on his back, between his shoulder blades, and then "rolled up" onto his

15  neck.  He stated that the blow pushed him into a stack of pots on the deck, which he hit with his chest.

16  After being crushed between the crab pots, plaintiff states that he crumpled to the deck, and then was

17  helped up by Mark Chinitz.  He stated that he told Captain Griffith that he "got smashed" between  two

18  crab pots and the captain was sympathetic, allowing him to take the wheelhouse instead of working the

19  deck.  After that, the captain ordered him back to work on the deck.

20       11.  Bob deWeiss and Stan van Metre, both of whom were on the deck at the time, testified that

21  they did not see plaintiff hit by a crab pot, and did not see plaintiff fall to the deck or lying on the deck.

22  Stan van Metre testified that he later heard from Captain Griffith that plaintiff was hurt and that therefore

23  he, the captain, would work the deck while plaintiff operated the boat.  Bob deWeiss testified that he did

24  not remember this particular instance of plaintiff leaving the deck, but that he did see Stan van Metre's

25  deposition regarding plaintiff leaving the deck.  Bob deWeiss stated that it was not unusual for plaintiff to

26  stop working and leave the deck because he was tired or cold.   Captain Griffith's testimony was not

27  presented by either party, although his unsworn written statement was presented as an exhibit.  Captain

28  MEMORANDUM AND DECISION - 4

Griffith stated therein that he did not see the incident but that work proceeded as usual for the entire day; the following day plaintiff claimed to be sore and took a few hours off and then returned to work. Defendants Exhibit A23.

12.   Mark Chinitz testified that plaintiff was hit in the chest, not the back, by a crab pot.  He also testified that he helped plaintiff get up, and helped him onto the galley to sit down.  As noted above, Mark Chinitz is not a credible witness on this or any other matter.

13.   Plaintiff testified that after this incident, he had pain in his back and neck, and felt his arms going numb.  Stan van Metre testified that after this plaintiff appeared to be in pain because he "didn't get around very good," he couldn't sleep, and he complained that his arm was going numb.

14.   The Court finds from this evidence that on January 21, 2004, plaintiff was bumped or struck on his back by a moving crab pot.  Because, as noted below, the Court finds plaintiff not entirely credible in his testimony, the force of this blow cannot be determined from his testimony nor from any other evidence presented.  Nor does any evidence apart from plaintiff's own self-serving testimony and Mark Chinitz's discredited testimony show that he fell to the deck.  In the close confines of the deck, it is extremely unlikely that he could have fallen without being noticed by Stan van Metre or Bob deWeiss.  The Court therefore cannot credit plaintiff's statement that he fell to the deck.  The Court further finds that after he was hit, plaintiff left the deck, and later he returned to the deck to work for the reminder of the fishing trip.

15.   In his end of season statement, signed January 27, 2004, plaintiff stated that he was injured on the boat as follows: "smashed between crab pots—back hurts 1-21-04 stepped in hole on deck ankle & knee hurt 1-14-04".

16.   After the short crab season the boat returned to Dutch Harbor, and then to Kodiak.  Plaintiff did not see a doctor in either place.  He testified that he asked to be taken to a doctor, but the captain refused.  He testified that he was unable to get into town on his own, and had no money to see a doctor. However, he also testified that he walked into Kodiak from the boat on Super Bowl Sunday to find the captain and ask him for money for a plane ticket.  The captain denied the request and plaintiff called his mother to ask her for the plane ticket money.  Plaintiff did not ask his mother for money to see a doctor

1   in Kodiak.  On cross-examination, plaintiff testified that he did not want medical treatment in Alaska

2   because the doctors there are not good; he knew this from growing up in Alaska.   This statement

3   contradicts his previous testimony that he repeatedly asked to be taken to see a doctor in both Dutch

4   Harbor and in Kodiak.

5           17.  Bob deWeiss testified that while the boat was docked in Dutch Harbor, plaintiff returned

6   from town drunk, climbed up onto crab pots stacked on the dock to help unhook one, and fell off, landing

7   on his back.  He further testified that plaintiff jumped back up and "laughed it off."  Plaintiff denied that

8   this occurred; he denied being drunk and denied falling off a stack of crab pots onto the dock.  The Court

9   has no reason to question the credibility of Bob deWeiss and finds his testimony more credible than

10  plaintiff's on this incident.  Further, his testimony is corroborated by a written statement of Captain

11  Griffith which was submitted as an exhibit.  Captain Griffith stated that on January 26, 2004, while they

12  were docked at Dutch Harbor and unloading pots, plaintiff showed up drunk and "tried to jump off a pot

13  on the dock and fell flat on his back."  Defendants' Exhibit 23.

14          18.  Plaintiff first saw a doctor on February 9, 2004, after his return to Seattle.  On his patient

15  registration form for this visit, plaintiff listed his chief complaints as "pain in back and knee."  Stipulated

16  Medical Records (hereafter "SMR") 164.  Similarly, on his Labor and Industries claim form, he stated

17  that the injured parts of his body were his back and left knee.  Jacob Grinberg, M.D., interviewed and

18  examined plaintiff and diagnosed a left knee sprain, work related, and low back and thoracic area sprain,

19  work related.  SMR 160.  He noted that plaintiff complained of bilateral hand numbness and left arm

20  numbness.  Neck pain was not mentioned at all.  Dr. Grinberg referred plaintiff for X-rays and asked him

21  to return in two weeks for follow-up.  Radiologist Bryan Leyton, M.D., read the X-rays and noted

22  findings of degenerative spurring at multiple levels in plaintiff's lumbar, thoracic, and cervical spine, but

23  no fractures.  SMR 161-162.  It appears from the medical records that plaintiff did not return to Dr.

24  Grinberg.

25          19.  When questioned at trial about the complete absence of any complaint of neck pain in Dr.

26  Grinberg's notes, plaintiff testified that Dr. Grinberg was Russian and did not communicate well.

27  However, upon review of Dr. Grinberg's dictated notes, the Court finds no indication whatsoever of

28   MEMORANDUM AND DECISION - 6

difficulty with the English language.  Further,  plaintiff himself clearly indicated on his patient registration form that his chief complaint was back and knee pain.  The Court finds plaintiff's testimony that he meant the word "back" to include his "neck" to be unconvincing.  The Court therefore finds that as of February 9, 2004, plaintiff did not have neck pain.

20.  On February 24, 2004, plaintiff saw neurologist Arthur Ginsberg, M.D., apparently at the request of counsel, to whom Dr. Ginsberg addressed his report.  SMR 167-170.   Dr. Ginsberg took plaintiff's history, which he reported as two injuries aboard the *F/V Lady Jessie*, namely the January 19 blow to the head with the headache ball, and the January 21, 2004 crab pot incident.  Plaintiff reported headaches as well as  weakness and numbness of his left arm and leg.  SMR 167.  Dr. Ginsberg noted tenderness upon palpitation of the high thoracic spine region.  SMR 168.  There was no mention by plaintiff of pain or other problems with his neck.  After a neurological examination, Dr. Ginsberg stated his impression of plaintiff's complaints as thoracic spine contusion, posttraumatic headaches, and posttraumatic left thoracic outlet syndrome.  SMR 169.  He recommended further testing, specifically an MRI of the head, cervical and thoracic spine; an EMG of the left upper extremity and cervical paraspinals, and a Doppler TOS study.  *Id.*  Plaintiff had numerous tests including electromyography on March 9, 2004.  SMR 170-174.  Dr. Ginsberg summarized the test results as follows: "Electrophysiologic evidence for acute left C7 radiculopathy with chronic characteristics.  Evidence for bilateral CTS, mild, left, moderately severe on the right."  SMR 175.

21.  In April 2004, plaintiff went to Maui, Hawaii, to work a stonemason job.  At trial, plaintiff was questioned about statements in his March 2005 deposition, in which he stated that he was vacationing in Maui, and went only "to look at a job."  In his deposition he could not remember at first the name of the person he traveled with, and then he remembered it incorrectly.  Nor could he remember for whom he worked.  He was vague about whether it was a private house that he worked on.  He also stated that he only did a little work on the job.  At trial, he explained that he was hired to show someone else how to do the work, which involved soapstone.

22.  At trial, plaintiff's girlfriend Camie Nygard testified to the following:  She had known plaintiff since October of 2003.  When plaintiff returned from the Alaska crabbing trip, he was restless

MEMORANDUM AND DECISION - 7

and could not sleep, and he complained of weakness and numbness in his arm.  He knew the person who hired him to work in Maui, but they were not friends.  Plaintiff was excited about the job because he would be working on Oprah Winfrey's house.  When he returned from Hawaii he was much worse.  The Court finds Camie Nygard a very credible witness.

23.  Evidence was introduced at trial that plaintiff and Brad Russell flew to Maui on tickets paid for by Thomas Cook.  Thomas Cook is the president of TMC Contracting in Maui.  He testified by deposition, stating that he hired Brad Russell and a helper (plaintiff) to build a fireplace because that is a skill not found among local masons on Maui.  Mr. Cook paid airfare, a rental car, and subsistence for the two men.  They arrived on April 8 and were to depart on April 22; they worked every day from April 8 to April 21 except weekends, from eight to eleven hours per day.  They asked to be paid in cash but Mr. Cook responded that this was a "legitimate, billable job" and that he needed invoices to show his clients and therefor would pay by check.  As general contractor, Mr. Cook was on the job site at least every other day; the fireplace was an important milestone in the project.  He observed that generally Mr. Russell did the measuring and layout, and plaintiff did the mixing and carrying of cement mortar and placing the heavy blocks.  The large blocks at the base of the foundation measured twelve by eight by sixteen inches; Mr. Cook guessed that these weighed seventy or eighty pounds apiece.  He testified that plaintiff had no difficulty handling these or the ninety-four pound bags of cement, which he mixed in the yard and then pushed in a wheelbarrow up a ramp to the fireplace site.  The only time Mr. Cook observed plaintiff demonstrate any pain was after a weekend fishing trip to Hana, when plaintiff cut his feet on the rocks and also either fell on the rocks or was bruised in a fight.  Mr. Cook observed a bruise on plaintiff's neck and cheek.  Mr. Cook also testified that there was considerable friction between plaintiff and Mr. Russell because plaintiff did all the hard work and Mr. Russell was always talking on the telephone.

24.  Mr. Cook was disappointed in the work done and declined to extend the contract after April 21 although the fireplace was only one-third complete.  Plaintiff called Mr. Cook several days later to say he was staying on Maui, and he asked to be hired to complete the fireplace.  When Mr. Cook replied that he was not interested in hiring plaintiff, plaintiff asked if he knew of other work on Maui.  Mr. Cook also stated that plaintiff did not at any time complain of physical limitations or mention the crab pot incident,

MEMORANDUM AND DECISION - 8

1    but he noted that would not have been a good way to try and get a job.  The Court finds Mr. Cook a

2    highly credible witness.  Although he was disappointed in the work done by plaintiff and Mr. Russell, his

3    disappointment was directed mainly at Mr. Russell, whom he hired as lead man on the job.  Mr. Cook had

4    no motive to alter or fabricate his testimony about plaintiff.

5        25.  Plaintiff testified at trial that he did not know the weight of the larger concrete blocks he used

6    at the base of the fireplace.  Evidence was introduced that the smaller blocks, eight by eight by sixteen

7    inches, weigh twenty-eight pounds.  Plaintiff testified that he did not do any hod carrying[1]; he stated that

8    a young Hawaiian man did that.  He also testified that Mr. Cook was wrong in stating that he did all the

9    heavy work, and he denied asking Mr. Cook for more work.   He denied having any dealings with Mr.

10   Cook and stated that he only saw him at the airport and on the last day.

11       26.  To the extent that plaintiff's testimony contradicts that of Mr. Cook, the Court finds Mr.

12   Cook's testimony more credible than plaintiff's self-serving testimony.  Plaintiff demonstrated at his

13   deposition in March, 2005 that he sought to conceal the fact that he went to Maui to work as a mason.

14   When he was questioned about his deposition statements at trial, plaintiff sought to minimize the

15   discrepancies, but his efforts were not convincing.  Further, plaintiff's trial testimony that he did not carry

16   hod is not credible because that was part of the job that he and Mr. Russell were hired to do, and there is

17   no evidence that anyone else was hired or paid to do the physical labor on that job.  Mr. Cook testified

18   that he personally observed plaintiff pushing the wheelbarrow with the cement into the house, and that

19   testimony is credible.  The Court therefore finds that plaintiff worked as a mason for eight to eleven hours

20   a day on Maui, for nine days; he lifted and placed large concrete blocks which weighed considerably more

21   than twenty-eight pounds as well as the smaller twenty-eight pound blocks, and he mixed and transported

22   the cement in a wheelbarrow.  When he and Mr. Russell were terminated from that job, plaintiff asked to

23   be hired by Mr. Cook to complete it, and asked for other masonry work on Maui.

24       27.  The next entry in plaintiff's medical records is dated May 26, 2004.  On that day, Dr.

25   Ginsberg signed a note "to whom it may concern," stating of plaintiff that he was "unable to work since

26

27           [1] "Hod" refers to the heavy mixture of mortar and cement used by masons.

28   MEMORANDUM AND DECISION - 9

1    on-the-job injuries of 1/19 and 1/21/04.  Needs evaluation and treatment."  SMR 177.   This note

2    demonstrates that Dr. Ginsberg was not informed of plaintiff's masonry work in Hawaii.

3        28.  Plaintiff had diagnostic MRI studies of his cervical and thoracic spine at Northwest Hospital

4    on July 1 and July 28, 2004.  SMR 180, 193.  The cervical spine study results were: C3-4, central disc

5    protrusion, appearance suggested an old process; C4-5, mild disc protrusion; C5-6, moderate paracentral

6    disc protrusion, age indeterminate without prior studies for comparison; C6-7, degenerative disc space

7    change, central disc protrusion and mild central canal narrowing.  SMR 180-181.  The thoracic study

8    found mild right paracentral disc protrusion at T6-7 without canal stenosis.  The remainder of the

9    thoracic spine was normal.  SMR 193.

10        29.  On July 29, 2004, plaintiff underwent a non-invasive evaluation for thoracic outlet syndrome.

11   George Thomas, M.D., noted plaintiff's history of having been "smashed between two crab pots on a

12   boat" and described plaintiff's symptoms as "indeterminate."  However, he noted that plaintiff's response

13   to the Roos exercise arm stress test indicated bilateral thoracic outlet syndrome with a strong arterial

14   component.  He noted a caveat that the arterial manifestation that led to this diagnosis could occur in the

15   presence of no symptoms or occur in the presence of brachial plexus direct injury, making the diagnosis

16   "a bit confusing."  SMR 195.

17        30.  Plaintiff saw Richard Peterson, M.D., a colleague of Dr. Ginsberg, for follow-up on August

18   4, 2004.  Dr. Peterson noted that plaintiff reported neck pain since the crab boat accident, and that MRI

19   studies indicated C6-7 disc protrusion which could account for the left arm symptoms.  Dr. Peterson

20   suggested conservative treatment and physical therapy.  Dr. Peterson also noted that plaintiff had a

21   history of symptoms, a physical exam, and a Doppler study all consistent with thoracic outlet syndrome,

22   and recommended that he see a surgeon for possible decompression.  SMR 199.

23        31.  Plaintiff saw Dr. Ginsberg again on August 31, 2004.  Dr. Ginsberg noted diagnoses of disc

24   herniation in the cervical spine at C5-6 and radiculopathy at C7; studies indicating thoracic outlet

25   syndrome, and evidence for bilateral carpel tunnel syndrome.  He recommended physical therapy and

26   consideration of a diagnostic root block at the C6 level together with epidural steroid injection.  SMR

27   202.

28    MEMORANDUM AND DECISION - 10

32.  On September 13, 2004, plaintiff saw Mark Wagner, M.D., for a second opinion on his thoracic outlet syndrome. Dr. Wagner noted that Dr. Ginsberg made a recommendation of physical therapy, but stated that plaintiff wanted "to have it taken care of surgically." SMR 205. Dr. Wagner referred plaintiff to George Thomas, M.D. for consultation on the surgery, and prescribed Percocet for the pain. It appears that plaintiff did begin physical therapy on September 21, 2004. SMR 212. On September 27 he returned to see Dr. Wagner, complaining of severe headaches, neck pain, upper back pain, and left arm pain and numbness. Dr. Wagner prescribed more Percocet and scheduled a follow-up visit in a week. SMR 214. Plaintiff saw Dr. Wagner again on October 4, 2004. Dr. Wagner noted that plaintiff found relief from the headaches with cervical traction. He again prescribed Percocet, and a home cervical traction unit, and referred plaintiff to neurologist Steve Klein, M.D. for a neurosurgical opinion. SMR 217. On October 14, 2004, plaintiff returned to Dr. Wagner's office complaining of migraine headaches and seeking more Percocet. Dr. Wagner was not in and the nurse made extensive notes regarding plaintiff's statements, behavior, and appearance. SMR 238. Plaintiff did obtain additional Percocet from Dr. Pitt. *Id.*

33. During October 2004, plaintiff consulted with two doctors regarding his thoracic outlet syndrome. On October 12, plaintiff saw George Thomas, M.D., who stated that plaintiff's symptoms suggested "more than positional thoracic outlet syndrome symptoms." SMR 227. He suggested that there were indications of involvement at the C6-C7-8 level, as well as constriction by neck muscles. *Id.* Dr. Thomas suggested further evaluation by a neurosurgeon. On October 25, 2004, plaintiff saw James Watson, M.D., of the Vascular Institute of the Northwest. Dr. Watson stated that there was a chance that plaintiff had a component of thoracic outlet syndrome, but his cervical disk disease was contributing to the problems and should be addressed first. SMR 245.

34. On October 27, 2004, plaintiff saw neurosurgeon Steven Klein, M.D. Dr. Klein described plaintiff's history as an on-the-job injury from being struck by two crab pots, followed by a second injury to the upper back a few days later. SMR 253. After a physical examination Dr. Klein concluded that surgery was not indicated for plaintiff's neck pain. *Id.*

35. On November 7, 2004, plaintiff was treated in the emergency room at Swedish Medical

MEMORANDUM AND DECISION - 11

1  Center/Ballard for injuries resulting from an assault.  Plaintiff's injuries were described as a closed head

2  injury, concussion, mastoid abrasion, and right shoulder strain.  SMR 262.  X-rays identified no acute

3  fracture or dislocation, but did find old, healed fractures of the right third and fourth ribs, as well as the

4  clavicle.  SMR 270.  Plaintiff's wounds were cleaned and dressed, and he was given a sling for his right

5  arm.  SMR 269.  Plaintiff had not mentioned these prior fractures to any of his treating physicians, even

6  when asked directly about previous injuries.  He testified at trial that he did not remember incurring

7  broken ribs or a broken clavicle.

8      36.  Plaintiff saw Dr. Ginsberg several days after the assault, on November 10, 2004.  Dr.

9  Ginsberg noted that plaintiff continued to complain "bitterly" of severe and intractable headaches, and

10  had obtained no relief from physical therapy.  He noted plaintiff's report that traction worsened his

11  thoracic outlet symptoms and caused severe headaches, and that plaintiff continued to take Percocet

12  every eight hours, with only slight relief.  Dr. Ginsberg also noted the injuries from the assault several

13  days previously.  SMR 273.  He recommended further diagnostic testing and massage therapy.

14      37.  On January 27, 2005, plaintiff saw neurosurgeon Varun Laohaprasit, M.D., for an evaluation.

15  Dr. Laohaprasit reported plaintiff's history on that day as having been struck in the back of his neck and

16  upper thoracic region by a 750-pound crab pot.   He noted that plaintiff did not have any neck pain,

17  headaches, or arm pain before this accident, but he noticed a sudden onset of all three symptoms after the

18  accident.  SMR 309.  There is no indication whatsoever that Dr. Laohaprasit was aware of plaintiff's

19  years of work as a stonemason before the fishing trip.  Dr. Laohaprasit recommended a cervical

20  myelogram CT to evaluate the neck problems, and surgery for the carpel tunnel syndrome.

21      38.  Plaintiff underwent surgery for left carpel tunnel release on February 9, 2005.  SMR 319.  On

22  February 15, 2005, he had the cervical myelogram.  SMR 341.  The test identified a moderate to severe

23  disc degeneration at C6-7, with impingement on the nerve roots; mild disc protrusion at C5-6 and C4-5;

24  moderate posterior osteophytic ridge and foraminal narrowing at C3-4.  SMR 342.

25      39.  Plaintiff returned to Dr. Laohaprasit on February 22, 2005 for stitch removal and follow-up

26  on the myelogram results.  At this visit, Dr. Laohaprasit noted for the first time that after plaintiff was

27  struck in the upper neck by the crab pot, he "fell down and hit his hand and wrist on the floor."  SMR

28  MEMORANDUM AND DECISION - 12

344.  Dr. Laohaprasit also stated that he believed that plaintiff developed a disc herniation and nerve injury due to the accident on the boat.  He further stated, "I believe that this severe accident should have killed him on the boat.  Fortunately he was not killed, but he developed three injuries . . . ," referring to the thoracic outlet syndrome, cervical disc herniation, and carpel tunnel syndrome.  *Id*.  Again, Dr. Laohaprosit's notes indicate no awareness whatsoever of plaintiff's prior work history as a stonemason. At deposition, Dr. Laohaprasit specifically stated that he was unaware of any other head injury incurred by plaintiff after the crab pot incident; this statement indicates that he was not informed of the November 2004 assault.

40.  Dr. Laohaprasit performed the discectomy and forminotomy at the C6-7 and C3-4 levels, together with laminar fusion  on April 4, 2005.  SMR 359-61.  It appears that plaintiff's recovery was unremarkable.  At a follow-up visit on April 21, 2005, Dr. Laohaprasit noted that plaintiff's neck pain, headaches, and arm pain were all improved.  SMR 411.  They discussed plans for carpal tunnel release on the right wrist in the near future.  Dr. Laohaprasit also recommended that plaintiff should not take morphine sulfate for his pain too long.  *Id*.

41.  On May 9, 2005, plaintiff saw Dr. Watson, the vascular surgeon, who recommended proceeding with surgery for the thoracic outlet syndrome.  SMR 412.

42.  Dr. Laohaprasit performed the right wrist carpel tunnel release on May 16, 2005.  SMR 417.

43.  On May 17, 2005, Dr. Watson performed surgery for the thoracic outlet syndrome.  This surgery involved resection of the first rib, and tenotomy of the pectoralis minor.  SMR 496.

44.  On May 24, 2005, plaintiff returned to Dr. Laohapraist for follow-up on the second carpel tunnel release.  He renewed plaintiff's prescription for morphine sulfate, but told him he would have to obtain it from Dr. Watson from then on.  He also declined to perform a multiple level cervical fusion on plaintiff.  He stated that at that time plaintiff had no significant neck pain and that he was happy with the outcome of both surgeries, the neck surgery and the carpel tunnel release.  SMR 503.

45.  On June 2, 2005, plaintiff returned to Dr. Ginsberg for evaluation.  Dr. Ginsberg noted that plaintiff had developed an infection at the site of his thoracic outlet surgery, and recommended he visit the emergency room for treatment of that.  Dr. Ginsberg noted that plaintiff continued to have severe

MEMORANDUM AND DECISION - 13

1   headaches, but they had improved.  Left arm numbness was gone.  However, plaintiff had developed

2   weakness in the left arm.  SMR 505.  This weakness and accompanying left shoulder pain were eventually

3   (on December 27, 2005) attributed by Dr. Ginsberg to possible nerve damage during the thoracic outlet

4   syndrome surgery.  SMR 602.

5        46.  Plaintiff, during this time, was also being seen at the 45th Street Clinic.  SMR 346, 351; 540.

6   On March 16, 2005, Cheryl Smalley, ARNP, of the 45th Street Clinic filled out a physical evaluation form

7   for the Department of Social and Health Services.  She listed three of plaintiff's complaints, namely

8   cervical disc herniation, carpel tunnel syndrome, and thoracic outlet syndrome, which she described as

9   "all due to a nearly fatal accident on a crab boat."  SMR 348.  She assessed his maximum work capacity

10  as sedentary.  On July 20, 2005, after the thoracic outlet syndrome surgery, she noted severe cervical and

11  left shoulder pain, "all since [the] fishing boat accident."  SMR 540.  She had not previously mentioned

12  the shoulder pain.

13       47.  Plaintiff obtained a referral from Nurse Smalley to the University of Washington Medical

14  Center Department of Rehabilitation for evaluation of his shoulder pain.   On October 10, and October

15  24, 2005, Patricia Barr, M.D. examined plaintiff and reported back to Nurse Smalley on her assessment.

16  SMR 576-596.  After interviewing plaintiff and examining "multiple records," she described the course of

17  events in his medical history as unclear.  SMR 591.  She stated that "over all of these surgeries, he has

18  reported little if any change in his symptoms."  SMR 577.   She noted that plaintiff was now requesting

19  surgery for his shoulder pain, and recommended that his primary care practitioner refer him to a shoulder

20  surgeon for evaluation.  SMR 592.

21       48.  Plaintiff was then referred by Nurse Smalley to James Smith, M.D. at Swedish Medical

22  Center for an orthopedic consultation.  On December 16, 2005, Dr. Smith interviewed plaintiff regarding

23  his medical history and noted that plaintiff thought his shoulder was injured in the November 2004

24  assault.  SMR 597.  However, the injury in that incident was to plaintiff's right shoulder, not his left.

25  SMR 262.  Dr. Smith also noted that plaintiff still reported arm numbness and tingling, as well as

26  weakness.  He reported obvious muscle wasting which he attributed to nerve injury of the suprascapular

27  nerve.  He recommended further evaluation and rehabilitation rather than surgical intervention for the

28   MEMORANDUM AND DECISION - 14

shoulder pain.  SMR 599.

49.  As noted above in FF # 44, plaintiff returned to see Dr. Ginsberg on December 27, 2005.  Dr. Ginsberg suspected that the nerve was injured during the course of the thoracic outlet syndrome, and referred plaintiff for an electromyelogram (EMG).  Dr. Ginsberg reported the results of the EMG on January 11, 2006, finding evidence for acute left suprascapular neurapraxia and chronic left C6-7 radiculopathy.  SMR 607.  This is the last entry in the medical records, so further recommendations for treatment do not appear.

50.  Plaintiff underwent an independent medical evaluation on July 5, 2005, following all of his surgeries.  Thoracic surgeon Howard Kellogg, M.D., examined plaintiff and reviewed the medical records.  He noted that plaintiff's current complaints were pain in the left shoulder, neck pain, headaches, and numbness in the arms, worse on the left side.  The numbness improved somewhat with the carpel tunnel releases but was still severe in the left arm.  After examining plaintiff and reviewing the records, Dr. Kellogg concluded that he could not identify thoracic outlet syndrome on either the left or the right side.  He noted that plaintiff's symptoms were variable and the headaches did not fit with the diagnosis.  Dr. Kellogg also noted that despite the multiple surgeries, plaintiff's symptoms were "essentially unchanged."  SRM 536.

51.  Dr. Kellogg testified at trial on behalf of the defense.  He stated that thoracic outlet syndrome is due to compression of the sub-clavian artery or brachial plexus as it passes over the first rib.  "False" thoracic outlet syndrome is caused by compression between muscle and bone.  True thoracic outlet syndrome is generally due to a congenital band between an accessory rib and first rib.  It is rarely caused by injury, because the force required would be severe enough to fracture the first rib.  It may also be caused by a fractured clavicle.  Dr. Kellogg testified that plaintiff was diagnosed with neurogenic thoracic outlet syndrome, but he opined that this diagnosis was not appropriate, because plaintiff's neurogenic symptoms did not improve after surgery.  Dr. Kellogg also noted that Dr. George Thomas' reputation in the medical community is that he diagnoses an excessive number of cases of thoracic outlet syndrome.  The Court finds that Dr. Kellogg was a highly credible witness.

52.  Orthopedic surgeon Kent Saltonstall, M.D., also testified on behalf of the defense.  At

MEMORANDUM AND DECISION - 15

defendants' request, Dr. Saltonstall interviewed and examined plaintiff on July 11, 2005, and reviewed his medical records. His testimony at trial was limited to what he saw up to and including the writing of his expert report. Dr. Saltonstall stated his opinion that plaintiff's carpel tunnel syndrome cannot be attributed to an event that took place on the crabbing voyage. With respect to plaintiff's neck surgery, he explained that Dr. Laohaprasit removed osteophytes—bony spurs that take years to form—in order to accomplish the nerve decompression. Osteophytes are not caused by a traumatic event. He noted that plaintiff did not originally complain of neck pain from the crab pot incident. As to the bulging discs, he testified that this is a normal incident of aging, something everyone experiences, generally without symptoms. Dr. Saltonstall also identified numerous examples of plaintiff's drug-seeking behavior throughout the medical record. Finally, he stated that a diagnosis or causation opinion must be based upon a complete and honest history of the patient. He stated his opinion that plaintiff was not truthful in giving his medical history to him or to other doctors, and he noted specifically that Dr. Laohaprasit did not obtain an accurate history from plaintiff. The Court finds Dr. Saltonstall a highly credible witness.

53. Plaintiff demonstrated that he was not entirely accurate and truthful in reporting his medical history in the following ways:

a. In his end-of-voyage statement, his complaints to Dr. Grinburg, and his initial consultation with Dr. Ginsberg, plaintiff mentioned only back pain, not neck pain. At trial he attempted to minimize this discrepancy by explaining that he meant "neck" as included when he said "back."

b. Dr. Ginsberg described plaintiff's past medical history at the February 24, 2004 visit as follows: "He was functioning at 100% prior to going to Alaska to go fishing and denies any prior significant accidents. He was working as a mason one week before he got on the fishing boat." Yet plaintiff testified at trial that his last day of employment as a mason was December 22, 2003, and he was terminated for showing up at work drunk. This statement is one of several in which plaintiff denied prior injuries, despite his history of broken ribs and clavicle.

c. As already noted, plaintiff had an old history of healed rib and clavicle fractures. He did not mention these at any time in his medical history to any of the physicians who were trying to diagnose and treat him. SMR 270. Plaintiff had also suffered a knife wound to the chest in 2003, resulting in a

MEMORANDUM AND DECISION - 16

puncture wound to the chest wall.  Plaintiff reported to the hospital that he accidently cut himself with a roofing knife, but he denied that the accident was work-related.  SMR 122, 129.  At trial plaintiff stated instead that he "got stabbed."   This stabbing incident was reported to an examining physician in July 2005, as an attack.  Defendant's Exhibit A-17, p. 22.  Therefore, his description of the wound as resulting from a slip with a roofing knife, as stated to the hospital at the time of injury, was false.   Further, this prior chest wound, which could have been significant to the thoracic outlet syndrome diagnosis, was not reported to any physician.

d.  Plaintiff did not tell Dr. Ginsberg that he performed work as a stonemason for two weeks in Hawaii, nor that he was injured there, whether it was by falling or by a fight.  This omission was highly significant, particularly in view of Camie Nygard's statement that plaintiff was "much worse" when he returned from Hawaii.

e.  Plaintiff did not mention to Dr.Ginsberg, nor any other doctor (except possibly Dr. Klein, see FF # 33), that he fell on his back on the dock in Kodiak.

f.  Plaintiff grossly exaggerated the severity of the blow from the crab pot to Dr. Laohaprasit, to the point where that doctor considered it a near-fatal blow.  Plaintiff also mentioned for the first time that he fell on his hands; previously he stated the blow drove him onto another pot and then he "crumpled" to the deck.  Dr. Laohaprasit was not informed of plaintiff's prior work as a stonemason, nor of the November 2004 assault and blow to the head.

g.  Plaintiff denied alcohol use to Dr. Laohaprasit.  SMR 309, 354.   Yet contemporaneous reports to other doctors admitted social use of alcohol.  SMR 313.   Plaintiff himself testified that he drank alcohol despite having undergone treatment for drug and alcohol abuse in 2001; he stated that he regarded that treatment as applying only to drug use and he was free to drink alcohol.  Plaintiff also denied any history of drug or alcohol abuse in a Department of Health and Social Services physical evaluation.  SMR 279.

h.  Plaintiff did not report his ongoing participation in drug and alcohol rehabilitation to any of his treating physicians.  This omission was possibly significant for the repeated prescriptions for Percocet and morphine sulfate.

MEMORANDUM AND DECISION - 17

i.  Plaintiff walked into Dr. Wagner's office clinic on October 14, 2004 demanding a prescription for Percocet for his headache; he stated he was having massive migraines and would "die" without pain relief.  The nurse described him as having glassy eyes and an odor of alcohol, and noted no photosensitivity, expression of pain, or nausea (plaintiff was eating chocolate).  The nurse asked plaintiff which doctor had diagnosed migraine and he answered "nobody." SMR 238.  Dr. Pitt wrote the prescription for Percocet and plaintiff was given an appointment with Dr. Wagner for October 19, 2004. The nurse wrote that "plaintiff is adamant that all his problems have been caused by his traction treatment here by our physical therapy department."  SMR 239.   This statement contradicts plaintiff's contention that his problems resulted from the crab pot incident on the boat.

54.  Because plaintiff was not truthful in his medical history, the Court cannot credit Dr. Laohaprasit's medical opinion that his thoracic outlet syndrome, carpel tunnel syndrome, or cervical spine problems were all caused by being struck with a crab pot.   Nor can the Court credit any other medical opinion that attributed plaintiff's symptoms to the crab pot incident.

55.  Plaintiff's work as a stonemason on Maui in April 2004 demonstrated that he was still capable of performing this work after the crabbing voyage.  Dr. Ginsberg's May 26, 2004, note stating that plaintiff was unable to work since the January 21, 2004 crab pot incident was written without knowledge that plaintiff had actually worked as a stonemason in Hawaii.

## CONCLUSIONS OF LAW

Having found these facts from the evidence presented,[2] the Court now makes the following Conclusions of Law:

1.  Plaintiff filed this suit pursuant to the Jones Act, 46 U.S.C. § 688, and general maritime law. The Court has jurisdiction of the matter pursuant to 28 U.S.C. § 1331.  Venue is proper in this district due to defendants' presence here.  The vessel F/V Lady Jessie has her home port in this district.

---

[2]The Court has not reviewed the testimony of other witnesses, including testimony regarding economic damages, nor made factual findings, as that is unnecessary in light of the conclusions of law that flow from the testimony regarding the crabbing voyage and the medical evidence.

MEMORANDUM AND DECISION - 18

2.   The Jones Act provides that "any seaman who shall suffer personal injury in the course of his employment may, . . . maintain an action for damages at law, . . . and in such action all statutes of the United Stated modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply. . . . 46 U.S.C.§ 688.

3.   Plaintiff was a seaman within the meaning of the Jones Act on January 21, 2004.

4.   In order to prevail on his negligence claim under the Jones Act, plaintiff has the burden of proving, by a preponderance of the evidence, that the defendant was negligent, and that such negligence was the cause of injury to the plaintiff.  Negligence is a cause of an injury if it played any part, no matter how small, in bringing about the injury, even if the negligence operated in combination with some other cause.  *In re Hechinger*, 890 F. 2d 202, 208 (9th Cir. 1989); *cert. denied,* 498 U.S. 848 (1990); *Ribitzki v. Canmar Reading & bates, Ltd. Parnership*, 111 F. 3d 658, 662 (9th Cir. 1997).

5.   The Court finds that plaintiff has not met his burden of proving, by a preponderance of the evidence, that the crab pot incident of January 21, 2004 played any part whatsoever in causing thoracic outlet syndrome, carpel tunnel syndrome, or cervical abnormalities.  The Court concludes from the facts as found above, that plaintiff was not truthful in stating his medical history to his treating physicians, did not mention prior history and injuries that could fully account for his symptoms, and concealed the additional work he did as a stonemason in April 2004.   There is no evidence that he suffered neck pain immediately after the crab pot incident, nor any credible evidence that plaintiff asked to see a doctor during or immediately after the voyage.   Further, there is no credible evidence that plaintiff suddenly acquired carpel tunnel syndrome on January 21, 2004, as Dr. Laohaprasit's opinion on this matter cannot be credited.  On the other hand, there is credible medical evidence that plaintiff did not suffer from thoracic outlet syndrome, or if he did, it was not caused by a blow to the back that plaintiff received on January 21, 2004.  There is also credible medical evidence that the osteophytes in plaintiff's cervical spine were acquired over a long period of time.  This fact, combined with the absence of credible evidence that he suffered an injury to his neck on January 21, 2004 leads to the conclusion that the crab pot incident did not cause a "lighting up" of an existing condition in his neck.

6.   In order to prevail on his claim of unseaworthiness under the Jones Act, plaintiff has the

MEMORANDUM AND DECISION - 19

1  burden of proving by a preponderance of the evidence that the F/V Lady Jessie was unseaworthy, and

2  that the unseaworthy condition was a cause of an injury to plaintiff.  A vessel is seaworthy if the vessel

3  and its parts and equipment are reasonably fit for their intended purpose, and operated by a crew which is

4  reasonably adequate and competent for the work assigned.   Conversely, the vessel is unseaworthy if the

5  vessel or any of its equipment is not reasonably fit for its intended purpose, or if its crew is not reasonably

6  adequate or competent to perform the work assigned.  *Ribitzki*, 111 F. 3d at 664.

7       7.  A vessel owner has a duty to provide adequate safety equipment for the vessel.  However, the

8  vessel owner is not required to furnish an accident-free ship.  The vessel owner is not required to have the

9  best parts and equipment, nor the finest of crews; it is required to have what is reasonably proper and

10 suitable for its intended use.  *Mitchell v. Trawler Racer*, 362 U.S. 539, 550 (1960); *Lee v. Pacific Far

11 East Line*, 566 F. 2d 65, 67 (9th Cir. 1977).

12      8.  Unseaworthness is a cause of injury if it played a substantial part in bringing about injury to the

13 plaintiff.  *Ribitzki*, 111 F. 3d at 665.

14      9.  The Court finds that plaintiff has failed to meet his burden of demonstrating, by a

15 preponderance of the evidence, that there was an unseaworthy condition on the F/V Lady Jessie.  The

16 movement of crab pots about the deck is a necessary component of the activity of crab fishing.  The crew

17 was advised and repeatedly reminded by Bob deWeiss to stand clear of the moving pots.  The length of

18 cable between boom and crab pot was greater than two feet as the pot was being lifted or lowered from

19 launcher or stack, but this too was a normal component of the fishing activity, not an unseaworthy

20 condition.  And although there is credible evidence that one of two rollers at the tip of the boom was

21 frozen, there is no evidence that this so adversely affected the operation of the crane as to constitute an

22 unseaworthy condition.  The cable still moved over the roller, only by sliding not rolling.

23      Nor was an unseaworthy condition created by the inexperience of the crew.  While plaintiff and

24 Mark Chinitz were inexperienced seamen, the other three, Captain Griffith, Stan van Metre, and Bob

25 deWeiss all had experience in the Bering Sea fishery.  In particular, crane operator Bob deWeiss had been

26 working in the Alaska fishery since 1978, and had served previously as master of a crab fishing vessel.

27 Finally, although there was considerable testimony about drinking on and around the boat, only one

28 MEMORANDUM AND DECISION - 20

instance of alcohol consumption during the actual fishing voyage was testified to; Stan van Metre was offered a single drink by Captain Griffith.  This one incident is insufficient to constitute an unseaworthy condition.

10. In order to prevail on his claim for maintenance and cure under the Jones Act, plaintiff has the burden of proving by a preponderance of the evidence that he was injured in the service of the vessel, and that maintenance and cure was not provided.  He must also establish the amount of maintenance and cure to which he is entitled. *Lipscomb v. Foss Maritime Co.,* 83 F. 3d 1106, 1108 (9th Cir. 1996).   As the Court has already found that plaintiff was not injured in the service of the vessel, plaintiff cannot meet his burden of proof, and he is not entitled to maintenance and cure.


### DECISION OF THE COURT

Plaintiff has failed to meet his burden of proof on any of his three claims.  The Court finds in favor of defendants on all plaintiff's claims in this matter.  The Clerk shall enter judgment accordingly.

Dated this 20 day of June 2006.


RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

MEMORANDUM AND DECISION - 21